## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MSPA CLAIMS 1, LLC, a Florida entity; MAO-MSO RECOVERY, LLC, a Delaware entity; MAO-MSO RECOVERY II, LLC, a Delaware entity,<br><br>               Plaintiffs,<br><br>vs.<br><br>AUROBINDO PHARMA USA, INC.; CITRON PHARMA, LLC; HERITAGE PHARMACEUTICALS, INC.; MAYNE PHARMA (USA), INC.; MYLAN PHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.;<br><br>               Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

1.     Plaintiffs MSPA Claims 1, LLC, a Florida entity, MAO-MSO Recovery, LLC, a Delaware entity, and MAO-MSO Recovery II, LLC, a Delaware entity (hereinafter collectively referred to as "Plaintiff"), on behalf of themselves and all others similarly situated, by and through the undersigned attorneys, bring this action against Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., Mayne Pharma (USA), Inc., Mylan Pharmaceuticals, Inc., and Teva Pharmaceuticals, Inc. (hereinafter collectively referred to as "Defendants"), and state as follows:

1

2.      The claims in this case arise from conspiracies between the Defendant pharmaceutical drug manufacturers to fraudulently inflate prices and reduce competition in the United States for Doxycycline Hyclate Delayed Release ("Doxy DR") and Glyburide causing third-party payers, like Plaintiff, to pay more money for generic drugs than they otherwise would have paid.

3.      The Plaintiff and class members suffered damages as a result of the Defendants' racketeering and anti-competitive conduct, and this lawsuit seeks reimbursement for the money lost by third-party payers for paying artificially inflated prices for these drugs.  The Plaintiff was assigned the recovery rights from third party payers who purchased or provided reimbursement for the various generic pharmaceutical drugs that are the subject of this lawsuit at supra-competitive prices as a result of Defendants' illegal conduct.

### JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). Members of the proposed classes are citizens of a different state than the Defendants. Furthermore, the aggregate amount in controversy exceeds $5,000,000.

5.      Additionally, Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class Members by reason of the violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

2

6.      Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, for damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class Members by reason of the violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act, 15 U.S.C. § 26.  In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367.

8.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the class period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

9.      This Court has personal jurisdiction over each Defendant since each Defendant: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts in the United States, including in this District; and/or (c) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

10.      Plaintiff MSPA Claims 1, LLC is a Florida entity, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, FL 33134.  MSPA Claims 1 is a citizen of the State of Florida and is not a citizen of the state of any of the Defendants.

3

Numerous third-party payers have assigned their rights to Plaintiff to recover payments for fraudulently-inflated prescriptions.  As part of those assignments, Plaintiff is empowered to pursue the claims of the third-party payers because they purchased the generic pharmaceutical drugs Doxy DR and Glyburide that are the subject of this Complaint at supra-competitive prices as a result of the Defendants' pattern of racketeering activity and anti-competitive conduct.

11.     Plaintiff, MAO-MSO Recovery, LLC is a Delaware entity with its principal place of business at 5000 S.W. 75th Avenue, Miami, FL 33155. Numerous third-party payers have assigned their rights to Plaintiff to recover payments for fraudulently-inflated prescriptions. As part of those assignments, Plaintiff is empowered to pursue the claims of the third-party payers because they purchased the generic pharmaceutical drugs Doxy DR and Glyburide that are the subject of this Complaint at supra-competitive prices as a result of the Defendants' pattern of racketeering activity and anti-competitive conduct.

12.     Plaintiff, MAO-MSO Recovery II, LLC is a Delaware entity with its principal place of business at 45 Legion Drive, Cresskill, NJ 07626. Numerous third-party payers have assigned their rights to Plaintiff to recover payments for fraudulently-inflated prescriptions. As part of those assignments, Plaintiff is empowered to pursue the claims of the third-party payers because they purchased the generic pharmaceutical drugs Doxy DR and Glyburide that are the subject of this Complaint at supra-competitive prices as a result of the Defendants' pattern of racketeering activity and anti-competitive conduct.

13.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of

4

business at 6 Wheeling Road, Dayton, New Jersey.

14.     Defendant Citron Pharma, LLC ("Citron"), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 2 Tower Center Boulevard, Suite 1101, East Brunswick, New Jersey.

15.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 12 Christopher Way, Suite 300, Eatontown, New Jersey.

16.     Defendant Mayne Pharma (USA), Inc. ("Mayne"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 3301 Benson Drive, Suite 401, Raleigh, North Carolina.

17.     Defendant Mylan Pharmaceuticals, Inc. ("Mylan") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.

18.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.

19.     None of the Defendants are citizens of the State of Florida.

20.     Whenever any reference is made in this Complaint to any representation, act or transaction of Defendants, or any agent, employees or representatives thereof, such allegations shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants, while acting within the scope of their actual or apparent authority,

5

whether they were acting on their own behalf or for their own benefit, did or authorized such representations, acts or transactions on behalf of Defendants, respectively.

## FACTUAL ALLEGATIONS

**I.     The Generic Drug Market**

21.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the "Hatch-Waxman" Act.  Its intention was to balance two seemingly contradictory interests: encouraging drug innovation, and promoting competition between brand and generic drugs in order to lower drug prices.  To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of market exclusivity for newly approved products; this increased the financial returns for investment in drug research and development.

22.     To promote price competition, the law established a new regulatory approval pathway for generic products to help ensure that generic drugs became available more quickly following patent expiration. To gain approval for a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") showing that the new drug is safe and effective for its intended use. Developing a new drug and obtaining an NDA can take many years and cost tens or hundreds of millions of dollars.

23.     The Hatch-Waxman Act encouraged faster approval for generic versions of brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs"). These applications rely on the safety and efficacy evidence previously submitted by the branded drug manufacturer, permitting generic manufactures to avoid conducting costly and duplicative

6

clinical trials.

24.    Hatch-Waxman succeeded in both of its goals.  Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to now representing over 80% of prescriptions filled, and a recent study found that generic medicines saved $193 billion for consumers in 2011 alone. During the same period, innovation has continued to lead to many new and helpful drugs.

25.    Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment, or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States.  In 2015, sales of generic drugs in the United States were estimated at $74.5 billion dollars.  Today, the generic pharmaceutical industry accounts for approximately 88% of all prescriptions written in the United States.

26.    A branded drug manufacturer that develops an innovative drug is rewarded with a patent granting a period of exclusive rights to market and sell the drug.  During this period, the manufacturer markets and sells its drug under a brand name, and if demand for the new drug is high, the lack of competition can permit the manufacturer to set its prices high as well.

27.    Once the brand-name drug's exclusivity period ends, other firms who have received FDA approval are permitted to manufacture and sell "generic" drugs that are equivalent to the brand-name drug.  As the makers of generic versions of the brand-name drug begin offering their equivalent products in the market, competition typically leads to dramatic reductions in price.  Generic versions of brand name drugs are typically priced lower than the

brand-name versions from the moment the first generic manufacturer enters the market. Under most state laws, generic substitution occurs automatically, which means pharmacies must fill prescriptions with generic versions unless the prescriber specifically indicates on the prescription that the branded drug must be "dispensed as written."

28.     As additional manufacturers enter the market, competition will push the price down even more.  Generally, as more generic competition enters the market, the price of a generic drug ends up as low as 20% of the branded price or even lower.  For this reason, generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system. The substantial cost savings gained from the growing number of generic drugs have played a major role in keeping the lid on overall increasing health care costs.

29.     The savings offered by generics drugs over their brand-name equivalents can provide tremendous benefits to all consumers and health care payers.  Patients typically see lower out of pocket expenses, while lower costs for payers and insurers can lead to lower premiums for all those who pay for health insurance, and lower costs to government health care programs like Medicare and Medicaid mean greater value for taxpayers.

## II.     The Drug Distribution System

30.     The United States prescription drug distribution system includes several entities that are involved at various stages of the distribution channels through which prescription drugs are delivered to patients.

### A.     Manufacturers and Suppliers

31.     Drug manufacturers are the source of the prescription drugs in the pharmaceutical

8

supply chain.  As opposed to branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic compounds that compete directly with the original branded version of a drug once the brand product's patent protection has expired.  Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, and creams.

32.    Generic drug manufacturers manage the actual distribution of drugs from manufacturing facilities to drug wholesalers, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and health plans.

33.    Drug manufacturers compete with one another to sell generic pharmaceutical drugs to entities in the distribution chain such as wholesalers and distributors.  Generic drugs are also sold in auctions to different purchasers in the supply chain, e.g., group purchasing organizations and large retail pharmacies and supermarket chains with pharmacies.

34.    The marketing practices of generic drugs often reflect almost no attempt at differentiation from other versions of the same product.  That is because, in essence, a generic drug is a commodity, which means, for the most part, competition is largely dictated based on a manufacturer's ability to provide supply and the price it charges for that specific generic drug. As a result, generic drug manufacturers usually market the drug under the name of the active ingredient, such that several generic drug producers market the product under the same name.

35.    Drug suppliers can include the manufacturers themselves, or other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company.  The Defendants in this action are all drug manufacturers/and or suppliers and

compete with one another for the sale of generic pharmaceutical drugs to consumers in the United States.

36.     Drugs sold in the United States may be manufactured domestically or abroad, and many manufacturers that produce drugs for the United States market are owned by, or are themselves, foreign companies.  For example, defendant Teva is a subsidiary or affiliate of one of the five largest drug manufacturers in the world, headquartered in Israel.  Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively.  Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers and distributors, group purchasing organizations, pharmacy benefit managers and some large retailers like pharmacy and supermarket chains.

**B.     Wholesalers/Distributors**

37.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, and long-term care and other medical facilities (e.g., community clinics, physician offices and diagnostic labs).  Some wholesalers sell to a broad range of potential customers while others specialize in sales of particular products (e.g., biologic products) or sales to particular types of customers (e.g., nursing homes).

38.     Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers. Some of the largest wholesalers and distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal Health,

Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation ("McKesson") and Morris & Dickson, LLC ("Morris & Dickson").

### C.    Group Purchasing Organizations

39.    Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group of purchasers. GPOs leverage their buying power to obtain better prices and terms for their members, and assist buyers in trade relations and contract management with sellers. GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains. Some of the largest GPOs include Vizient (formerly Novation), Premier, Inc., Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions ("Econdisc").

### D.    Pharmacy and Supermarket Chains

40.    Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient. There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies. If a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers may agree to contract with them directly. Such retailers can obtain attractive terms by avoiding the markups or fees collected by wholesalers, distributors, and GPOs. Retailers large enough to purchase drugs directly from manufacturers include Rite Aid Corporation ("Rite Aid"), The Walgreen Company ("Walgreens"), Wal-Mart Stores, Inc. ("Walmart"), Target Corporation, and Publix Super Markets, Inc. ("Publix"), among others.

11

### III.    Opportunities for Collusion

41.    The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly using interstate communications, and in person, on a frequent basis.

### A.    Trade Association and Customer Conferences

42.    Many customers of the Defendants, including but not limited to (a) large wholesalers or distributors like ABC, Cardinal, HD Smith, McKesson and Morris & Dickson, (b) group purchasing organizations like Premier, Inc., MMCAP and Econdisc, and (c) other large drug purchasers like pharmacy or grocery store chains, hold multi-day conferences throughout the year where many if not most of the generic manufacturers across the United States are invited to attend.

43.    In addition, the Defendants and other generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") and Efficient Collaborative Retail Marketing ("ECRM"), among others.

44.    At these various conferences and trade shows, sales representatives from many generic drug manufacturers, including the Defendants, have opportunities to interact with each other and discuss their respective businesses and customers. Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity

to meet with competitors outside of the traditional business setting. Of particular importance here, generic drug manufacturer representatives who attend these functions, including the Defendants, use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

45.    In short, these trade shows and customer conferences provide generic drug manufacturers, including but not limited to the Defendants, with opportunity to meet, discuss, devise, and implement a host of anti-competitive schemes that unreasonably restrain competition in the market for generic drugs and allow for the fraudulent manipulation of generic drug prices.

**B.    Industry Dinners and Private Meetings**

46.    In addition to these frequent conferences and trade shows, sales representatives get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.

47.    A large number of generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.

48.    In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New

Jersey. An executive from defendant Aurobindo attended this particular dinner.

49.     At these industry dinners, one company is usually responsible for paying for dinner for all of the attendees. The company that pays the bill is generally determined by alphabetical order. Conversations regarding such arrangement were held in a group email correspondence among the competitors, including a high-ranking executive for one of the participants, in December 2013.

50.     Female generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners. During GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.

51.     "Women in the Industry" dinners were typically organized by a female salesperson from Defendant Heritage, who resides in the State of Minnesota. Other participants in those meetings were typically employees of generic drug manufacturers located in Minnesota, or female salespeople residing in the area—but not exclusively.

52.     Several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving defendants Citron and Heritage, among others); (2) in Baltimore in May (involving defendants Citron, Heritage and Teva, among others); and (3) at the NACDS conference in August (involving defendants Citron, and Heritage, among others).

**C.     Information Sharing**

53.     As a result of these various interactions, sales and marketing executives in the generic pharmaceutical drug industry are often acutely aware of their competition and, more

14

importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to allocate a given market so as to avoid competing with one another on price.

54.     Defendants and other generic drug manufacturers routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

55.     Defendants and other generic drug manufacturers also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

## IV.    Generic Drug Price Spikes Since 2013

56.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout 2013 and 2014. According to one report, "[t]he prices of more than 200 generic medications increased an average of 448 percent between July 2013 and July 2014."

57.     A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices sometimes spiking by

15

600% to 2,000% in some cases.

58.     More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

## V.     Market Allocation Agreement to Maintain Market Share and Avoid Price Erosion Caused by Competition

59.     When entering a generic drug market, Heritage and other Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price.  These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition when in fact none existed.

60.     Doxycycline Hyclate Delayed Release ("Doxy DR"), also known by the brand name Doryx, is a tetracycline-class antimicrobial indicated as adjunctive therapy for severe acne.

61.     Heritage entered the market for Doxy DR on July 2, 2013.  The only other generic manufacturer selling Doxy DR at that time was Defendant Mylan.

62.     Even before Heritage began selling Doxy DR, representatives of the company began to communicate with Mylan in an effort to divide the market in order to refrain from competing with each other on price.  These communications occurred over the wires and through the U.S. postal service and crossed state lines (Mylan and Heritage are based in different states).  Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable.

16

63.    On May 2, 2013, Jason Malek, President of Commercial Operations at Heritage coordinated a call over interstate wires between Malek, in New Jersey, and the Vice President of Sales at Mylan, in Pennsylvania. It was revealed that the Vice President of Sales at Mylan had little to do with National Accounts, and Malek was recommended to another contact at Mylan.

64.    Malek promptly connected with the Mylan employee through the website LinkedIn, again using the wires. Over the next several weeks, Malek and the Mylan employee communicated by phone on multiple occasions, and those communications crossed state lines.

65.    During the course of these communications, Heritage and Mylan executives agreed to allocate market share and refrain from competing with one another for customers in the market for Doxy DR. The objective was to avoid a price war which would reduce profitability for both companies and, thus, would maintain elevated prices for the generic. Mylan agreed to "walk away" from at least one large national wholesaler and one large pharmacy chain to allow Heritage to obtain the business and increase its market share. By avoiding competition, this caused the price of Doxy DR to remain elevated, cause financial harm to the wholesaler and, in turn, consumers and third-party payers.

66.    On the rare occasion that Mylan insisted on competing for business that Heritage believed it was entitled to, Heritage contacted Mylan directly to address the situation, as occurred in a November 25, 2013 email between Malek and a Mylan contact. This email was sent over interstate wires.

67.    Malek also emailed Jeffrey Glazer (Heritage's President and CEO) that same day, again using the wires, and Glazer's response made clear the purpose of the agreement with

17

Mylan (to maintain high prices) and questioned whether Heritage should take any action that would disrupt that agreement.

68.    In February of 2014, a new competitor entered the market for the 150mg tablets of Doxy DR. Defendant Mayne (formerly Midlothian Labs) approached Heritage even before it began selling the generic drug, in an attempt to obtain some of Heritage's market share. Mayne and Heritage spoke regarding the matter on January 7, 2014 using the telephone system over interstate wires—between New Jersey and North Carolina.

69.    Shortly thereafter, Heritage was solicited by a large wholesaler requesting a bid for Doxy DR. It was learned from the wholesaler that Mayne had provided an unsolicited bid for the Doxy DR business, which prompted the wholesaler to approach the incumbent supplier, Mylan, to see if Mylan would match the price in order to retain the contract. This process is a customary practice in the industry and often referred to as a "Right of First Refusal" ("ROFR"). An ROFR is often included as a term in supply contracts between manufacturers and their customers, giving the incumbent manufacturer the right to beat a competitor's price and retain the business. Because the unsolicited Mayne bid essentially re-opened the bid process, the wholesaler asked Heritage if it would like to bid on Doxy DR as well.

70.    Malek conceded during an internal discussion that Heritage had the Doxy DR supply to fulfill the contract; providing a bid would be perceived as an attack on Mylan's business and may result in retaliation.

71.    The next day Heritage responded to the wholesaler, using interstate wires, and declined to provide a bid. The reason given to the customer for the inability to provide the bid

18

was that Heritage might not have enough supply to fulfill a contract with the wholesaler. This was a falsehood and fraud since, three days later, Heritage approached a different customer—a pharmacy chain—and asked if Heritage could bid for that company's Doxy DR business. Using the wires, and in furtherance of the effort to keep prices for Doxy DR inflated, Heritage misled a potential wholesaler, and that fraud directly caused all third-party payers who purchased drugs from the wholesaler, to pay higher prices.

72.     Consistent with their agreement, when Mayne entered the Doxy DR market, it avoided bidding on Heritage customers and chose instead to target Mylan, which had roughly 60% of the Doxy DR market. Mylan, however, consistently protected its business, choosing not to allow Mayne to acquire market share. An internal Mayne email correspondence on February 21, 2014 discussed the fact that Mylan had again protected its business with a particular wholesaler. Mayne learned this information from the wholesaler.

73.     During this time period, Heritage continued to honor its agreement with Mylan not to target Mylan's Doxy DR accounts. This was confirmed in internal communications involving Malek on August 29, 2014.

74.     Mayne had previously put in offers to McKesson's One Stop program and Encondisc and did so once more in November, 2014.

75.     On November 24, 2014, Heritage floated the idea that it may be willing to walk from Econdisc if Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to Mckesson.

76.     When Econdisc put the Doxy DR business out to bid again in January of 2015,

19

Heritage made sure that it bid a higher price than Mayne, fulfilling its agreement by "walking" from Econdisc. On information and belief, Mayne also overbid its Mckesson contract, effectively walking away from the contract.

77.    In September, 2015, Heritage was approached by a large nationwide pharmacy chain requesting a bid on Doxy DR. It was confirmed internally that Heritage had the capacity to bid. Malek was cautious, however, in light of Heritage's agreement with Mayne.

78.    Heritage found out that the incumbent supplier was Mayne and confirmed with Mayne, using interstate wires, that the latter had no supply issues and that the pharmacy chain was simply shopping for a better price. Heritage thus refused to provide a bid in accordance with its agreement with Mayne for the two manufacturers to not compete with each other and avoid price erosion. This collusion had the effect of keep the price of Doxy DR inflated.

## VI.    Agreements to Fix Prices and Defraud Wholesalers, Consumers, and Third-Party Payers

79.    In addition to reaching agreements with competitors to allocate markets for a number of different generic drugs, Heritage and other Defendants routinely sought and obtained agreements with competitors to fix and raise prices, causing economic harm to consumers and third-party payers.

80.    Glyburide is an oral diabetes medication used to treat Type 2 diabetes. Also known by the brand names DiaBeta or Micronaise, it is used to control blood sugar levels.

81.    Heritage held a teleconference on April 22, 2014, where members of the Heritage sales team as well as Malek identified a large number of drugs that Heritage targeted for price

increases. The list included the generic drug Glyburide. Heritage's competitors in the market for Glyburide at that time were defendants Aurobindo and Teva.

82.    To accomplish the objective, Malek instructed members of the sales team to immediately reach out to their contacts at each competitor on the list of drugs, and attempt to reach agreement on the price increases. Different Heritage employees were responsible for communicating with different competitors.

83.    Malek himself was responsible for communicating with Defendant Teva, which was a competitor on several of the drugs on the list, including Glyburide. Malek had a direct relationship with a contact inside Teva, and was able to successfully communicate with her and reach an agreement to raise prices on Glyburide, among other drugs. Since Teva is was based in Pennsylvania, this communications through the wires—which were in furtherance of a scheme to obtain higher profits by selling inflated drugs at the expense of wholesalers, consumers, and third-party payers—routinely crossed state lines.

84.    In response to Malek's directive, the Heritage sales team started contacting their competition immediately.

85.    Both Malek and Glazer pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices. An April 28, 2014 email from Malek to a Heritage employee referred to Heritage's strategy for obtaining agreements with Defendant Aurobindo to raise prices.

86.    Such efforts continued throughout this period and on May 9, 2014, Heritage had another teleconference to discuss the contemplated price increases, including for Glyburide.

87.     Price increase strategies were discussed with a number of different competitors at the MMCAP conference. An agreement was confirmed with Defendant Aurobindo to raise the price of Glyburide. This was later recounted in an internal email to Malek dated May 15, 2014.

88.     On June 23, 2014, Heritage employees discussed the specific percentage amounts they would seek to increase certain drugs, and the strategies for doing so. Glyburide was among those included on the list, and was slated for a 200% increase.

89.     Heritage employees continued to reach out to their competitors over the next several weeks to obtain additional agreements to raise prices. For example, on June 25, 2014, a Heritage employee texted her friend at Citron, usinsg interstate wires, to determine whether Citron would be selling Glyburide in the near future. A Citron employee called Heritage shortly after this exchange, informing Heritage that its employees should not communicate with Citron through email—suggesting a concern that their use of interstate wires could expose them to significant liability. An employee at Heritage was also informed to call at Citron if she had information to convey.

90.     Malek continued to push Heritage employees to discuss the price increases with competitors. This strategy was communicated to the Heritage sales team in an email dated July 1, 2014.

91.     Heritage and Citron communicated frequently by phone, text message, and in person to discuss Glyburide pricing, bidding strategies, and how Citron might be able to acquire additional market share.

## VII.    Efforts to Conceal these Schemes

22

92.     The Defendants were aware that their conduct was illegal since hey all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.

93.     For example, going back to at least 2012, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing.  None of the email accounts maintained by Heritage had any company-imposed document retention policy associated with them.  Heritage executives were aware of this, and utilized the lack of a company retention policy to routinely destroy emails that might disclose their conduct.  Heritage executives were aware that in order to permanently destroy an email, however, the email had to be deleted from more than just the recipient's inbox.  For example, on June 27, 2012, Heritage CEO Glazer sent an email to Malek instructing him about the proper way to destroy email communications.

94.     Glazer continued to remind Malek not to put any evidence of his illegal conduct into writing.  Glazer sternly warned Malek about his use of email in a text message dated June 26, 2014.  Glazer then made the point, again, in an email to the entire sales team at Heritage that very day.  These communications were sent over the wires.

95.     There was even more urgency to avoid detection as Defendants became more aware that they were under state and federal investigation.  For example, on June 2, 2015, after it had become public that the Connecticut Attorney General's Office and the United States Department of Justice were investigating the industry, Malek sent a text message which referenced an email that was not produced to the Connecticut Attorney General's Office in

response to its subpoena to Heritage.  Upon information and belief, the referenced email has, along with other relevant documents, been deleted by Heritage.

96.    Upon information and belief, Glazer, Malek and certain other Heritage employees also deleted all text messages from their company iPhones regarding their illegal communications with competitors.

97.    An employee of Defendant Mayne, realizing the illegal nature of the agreements she entered into, also deleted several of the most incriminating text messages from her cell phone before the data on her phone was imaged and produced to the Connecticut Attorney General's Office.

98.    On December 12 and 13, 2016, the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek.[1]  DOJ alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of doxycycline and glyburide sold in the United States. Each charged with two felony counts under the Sherman Act (15 U.S.C. §1). By January 10, 2017 both plead guilty.

## VIII.  Market Effects

99.    The racketeering activity of the Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the generic pharmaceutical drugs identified herein, and have directly resulted in an increase in consumer prices for those drugs.

---

[1] *United States v. Glazer*, No. 16-cr-506 (E.D. Pa., Dec. 12, 2016); *United States v. Malek*, No. 16-cr-508 (E.D. Pa., Dec. 13, 2016).

100.    By unreasonably and illegally restraining competition for the generic pharmaceutical drugs identified herein, Defendants have deprived consumers and third-party payers, and all other entities that purchased Doxy DR and Glyburide, of the benefits of competition that the federal antitrust laws are designed to promote, preserve and protect.

101.    As a direct and proximate result of the unlawful conduct alleged in this complaint, Class Members were not and are not able to purchase, or pay reimbursements for purchases of the generic pharmaceutical drugs identified herein, at prices determined by a market unhindered by the impact of Defendants anticompetitive behavior. Instead, they have been and continue to be forced to pay artificially high prices. Consequently, they have suffered substantial injury in their business and property in that, inter alia, they have paid more and continue to pay more for the various generic pharmaceutical drugs identified herein than they would have paid in an otherwise competitive market.

102.    As a direct and proximate cause of the unlawful conduct alleged above, the Class Members have sustained injury are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct.

## CLASS ALLEGATIONS

103.    Plaintiff brings this action on behalf of itself and the following class:

All persons and entities in the United States and its territories who purchased, paid, provided reimbursement, and/or possess the recovery rights to reimbursement, for some or all of the purchase price of Defendants' generic drugs Doxy DR and Glyburide from January 1, 2013 to present. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; and (c) any judges or

25

justices involved in this action and any members of their immediate families.

104.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 both individually and on behalf of (a) a national injunctive class and/or (b) a national damage class and/or (c) various state-wide damage sub-classes, during the period from January 1, 2013 to the present.

105.    As discussed in this Class Action Complaint, Defendants have enjoyed ill-gotten gains from the sales of Doxy DR and Glyburide at the expense of Class Members suffering damages to their property and business.  Such damages apply to all Class Members (and Plaintiff as the rightful assignee of those organizations that assigned their recovery rights to Plaintiff). Class action law has long recognized that, when a company engages in conduct that has uniformly harmed a large number of claimants such as Plaintiff, other third-party payers, and consumers, class resolution is an effective tool to redress the harm.

106.    Here, the Class Members have been deprived of property and money by being caused to purchase prescriptions of generic drugs Doxy DR and Glyburide at unlawfully high prices and volumes as a direct result of Defendants engaging in racketeering activity and anti-competitive conduct, as alleged throughout this Complaint.

107.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

    a.    Numerosity:  There are thousands of entities and individuals (including the organizations that assigned their rights to Plaintiff) throughout the United States

26

that were forced to pay artificially inflated, supra-competitive prices for Doxy DR and Glyburide. Thus, the numerosity element for class certification is met.

b. Commonality:  Questions of law and fact are common to all members of the Class. Specifically, Defendants' misconduct was directed at all members of this Class.  Defendants' illegal pattern of racketeering activity and anticompetitive conduct had a common, adverse effect on all purchasers of the drugs Doxy DR and Glyburide. All members of the Class have common questions of fact and law, i.e., whether Defendants engaged in a pattern of racketeering activity, conspired to allocate markets, restrict competition, and substantially increase prices of Doxy DR and Glyburide. Each Class Member shares the same needed remedy, i.e., reimbursement for the inflated prices and lost money due to the Defendants' racketeering activity, disgorgement of the Defendants' profits from the illegal venture, and imposition of injunctive and equitable relief to stop Defendants from continuing in their activities.

c. Typicality:  Plaintiff's claims are typical of the claims of the Class because their claims arise from the same course of conduct by Defendants, i.e., racketeering activity, artificially inflating prices, allocating markets, and restricting competition within the marketplace. Plaintiff paid or reimbursed for prescriptions of Doxy DR and Glyburide at supra-competitive prices and as a consequence of Defendants' pattern of racketeering activity. Plaintiff's claims are, therefore, typical of the Class.

d.  Adequacy:  Plaintiff will fairly and adequately represent and protect the interests of the Class. Its interests in vindicating these claims are shared with all members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in class action litigation.

108.    The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior.  Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class.  Defendants deliberately conspired to drive up prices of the generic drugs Doxy DR and Glyburide by engaging in a pattern of racketeering activity, allocating markets and illegally restricting competition through agreements, contracts, and combinations, thus depriving both Plaintiff as assignee of the right to recovery and Class Members of their right to pay prices that have been set by the dynamics of a competitive market.

109.    The Class is also properly brought and should be maintained as a class action under Rule 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

110.    Plaintiff alleges that it would have paid significantly less for generic doxycycline hyclate and glyburide if Defendants had not engaged in racketeering and anticompetitive conduct.  Additionally, Plaintiff alleges it would have paid for fewer prescriptions of generic doxycycline hyclate and glyburide but for Defendants' illegal and wrongful conduct.

## CAUSES OF ACTION

28

I.    **Count I:  Racketeer Influenced and Corrupt Organizations ("RICO") Violations Pursuant to 18 U.S.C. §§ 1962(c) and 1964(c)**

111.    Plaintiff incorporates by reference paragraphs 1 through 110 as if fully set forth herein.

112.    It is unlawful for any person employed by or associated with any enterprise engaged in interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(c).

113.    A "person" is defined broadly to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).  Defendants and the Plaintiff all qualify as "person" within the meaning of the statute.

114.    The Defendants' were engaged in an Enterprise involving interstate commerce.

115.    An Enterprise constitutes any union or group of individuals associated together for a common purpose of engaging in a course of conduct.

116.    Defendants' Enterprise consisted of working together to make the price of various generic drugs as high as feasible.  This Enterprise existed independent and apart from the pattern of racketeering activity described below, was ongoing during the alleged class period, and functioned as a continuing unit as evidenced by consensual decision-making structures among the Defendants.   Moreover, each named Defendant exists as a company independent and apart from the Enterprise itself.

117.    The participants within this Enterprise include those entities named as

29

Defendants.

118.    In furtherance of this Enterprise, the Defendants engaged in pattern of racketeering activity.

119.    "A 'pattern of racketeering activity' requires at least two acts of racketeering activity[,]" 18 U.S.C. § 1961(5), and "racketeering activity" is defined as "any act which is indictable under . . . section 1341 (relating to mail fraud) [or] section 1343 (relating to wire fraud) . . ." 18 U.S.C. § 1961(1).  Thus, a "pattern of racketeering activity" is established by showing at least two violations of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud), which were done in furtherance of the Enterprise.

120.    The elements of mail fraud are (1) a scheme to defraud, (2) which involves the use of the mails, (3) for the purpose of executing the scheme. 18 U.S.C. § 1343.

121.    The elements of wire fraud are (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme. 18 U.S.C. § 1343.

122.    As alleged at various places throughout this Complaint, the Defendants used interstate wires and the mail system to perpetuate a fraudulent scheme designed to make wholesalers, consumers, and third-party payers pay more for generic drugs than they should have.  These communications furthered the Defendants' fraudulent scheme by allowing Defendants to submit false explanations for higher bids, false statements about drug supplies, coordinate among the Enterprise participants to form bidding strategies and pricing proposals, and to help conceal the fraudulent activity.

123.    Accordingly, the Defendants formed an Enterprise aimed at inflating generic drug

30

prices and, together, engaged in a pattern of racketeering activity to further that Enterprise. As such, the Defendants violated the RICO Act pursuant to 18 U.S.C. § 1962(c).

124.    Pursuant to 18 U.S.C. § 1964(c), any person injured in his business or property by reason of a violation of Section 1962 may sue in any appropriate United States district court and shall recover threefold the damages sustained and the cost of the suit, including reasonable attorney's fees.

125.    Plaintiff and the Class have sustained significant economic injuries as a direct result of the Defendants violations of 18 U.S.C. § 1962(c). Specifically, Plaintiff (and the various third-party payers who assigned their recovery rights to the Plaintiff) and the Class paid for prescriptions of generic drugs at prices that were significantly higher than they would have been absent to the violations of 18 U.S.C. § 1962(c). Thus, Plaintiff, and the Class, lost substantial money and property as a result of the RICO violations.

126.    Accordingly, because of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and the Class for three times the damages sustained, plus the costs of this suit, including reasonable attorney's fees.

**II.    Count II: Racketeer Influenced and Corrupt Organizations ("RICO") Violations Pursuant to 18 U.S.C. §§ 1962(d) and 1964(c) -- Conspiracy**

127.    Plaintiff incorporates by reference paragraphs 1 through 110 as if fully set forth herein.

128.    To the extent that any Defendant is not liable, directly, for participating in the violations of 18 U.S.C. § 1962(c) as alleged above, Plaintiff also asserts claims under 18 U.S.C.

31

§ 1962(d).

129.    Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate 18 U.S.C. § 1962(c).

130.    Participation in a RICO conspiracy occurs when one knowingly agrees to perform services of a kind which facilitate the activities of those who are operating the enterprise.  It is an agreement, not to operate or manage the enterprise, but to facilitate the activities of those who do.

131.    Here, Defendants knowingly facilitated the activities of the Enterprise by, inter alia:

132.    Deliberately making false bids and statements concerning available supply to create higher prices for generic drugs;

133.    Knowingly destroying documents and evidence of the Enterprise's racketeering activity, in particular, after learning about investigations by various governmental entities, including the Attorney General of Connecticut; and

134.    Entering into market share agreements designed to perpetuate higher prices for generic drugs.

135.    Pursuant to 18 U.S.C. § 1964(c), any person injured in his business or property by reason of a violation of Section 1962 may sue in any appropriate United States district court and shall recover threefold the damages sustained and the cost of the suit, including reasonable attorney's fees.

136.    Plaintiff and the Class have sustained significant economic injuries as a direct

32

result of the Defendants violations of 18 U.S.C. § 1962(d).  Specifically, Plaintiff (and the various third-party payers who assigned their recovery rights to the Plaintiff) and the Class paid for prescriptions of generic drugs at prices that were significantly higher than they would have been absent to the violations of 18 U.S.C. § 1962(d).  Thus, Plaintiff, and the Class, lost substantial money and property as a result of the RICO violations.

137.    129.    Accordingly, because of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and the Class for three times the damages sustained, plus the costs of this suit, including reasonable attorney's fees.

### III.    Count III:  Sherman Act Violations Pursuant to 15 U.S.C. §§ 1, 3

138.    Plaintiff incorporates by reference paragraphs 1 through 110 as if fully set forth herein.

139.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3).

140.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

141.    During the Class Period, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic doxycycline hyclate and glyburide.

142.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic doxycycline hyclate and glyburide.

33

143.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class, who purchased generic doxycycline hyclate and glyburide, have been harmed by being forced to pay inflated, supra-competitive prices.

144.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

145.    Defendants' conspiracy had the following effects, among others:

    a.  Price competition in the market for generic doxycycline hyclate and glyburide has been restrained, suppressed, and/or eliminated in the United States;

    b.  Prices for generic doxycycline hyclate and glyburide provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

    c.  Plaintiff and members of the Class who purchased generic doxycycline hyclate and glyburide from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

146.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for generic doxycycline hyclate and glyburide purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

147.    The alleged contract, combination, or conspiracy is a *per se* violation of the

34

federal antitrust laws.

148.    Plaintiff and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.[2]

## IV.    Count IV: Violation of State Antitrust and Consumer Protection Statutes

149.    Plaintiff repeats the allegations in paragraphs 1 through 110 as if fully set forth herein.

150.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic doxycycline hyclate and glyburide in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

151.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic doxycycline hyclate and glyburide and to allocate customers for generic doxycycline hyclate and glyburide in the United States.

152.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic doxycycline hyclate and glyburide at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and other similarly

---

[2] Plaintiff and the class reserve the right to amend this claim to assert specific damages incurred as a result of Defendants' wrongful conduct as discovery progresses.

situated third party payers in the Class with respect to generic doxycycline hyclate and glyburide provided in the United States; and (b) participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

153.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic doxycycline hyclate and glyburide.

154.    Defendants' anticompetitive conduct described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, et seq. Defendants' combinations or conspiracies had the following effects: (1) price competition for generic doxycycline hyclate and glyburide was restrained, suppressed, and eliminated throughout Arizona; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the

36

foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and other similarly situated third party payer in the Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

156.   Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code Section § 16720. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of generic doxycycline hyclate and glyburide at supracompetitive levels. The aforesaid violations of Section 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic doxycycline hyclate and glyburide. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the prices of generic doxycycline hyclate and glyburide. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic doxycycline hyclate and glyburide has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic doxycycline hyclate and glyburide provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-

37

competitive levels in the State of California and throughout the United States; and (3) those who purchased generic doxycycline hyclate and glyburide directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property in that they paid more for generics Doxy DR and Glyburide than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720, Plaintiff and other similarly situated third party payers in the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4501, et seq. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and other similarly situated third party payers in the Class including those who resided in the District of Columbia and/or purchased generic doxycycline hyclate and glyburide that was shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and other similarly situated third party payers in the Class, including those who resided in the District of Columbia and/or purchased generic doxycycline hyclate and

38

glyburide in the District of Columbia that was shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class, have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-1, et seq. Defendants' unlawful conduct had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their

39

business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, et seq.  Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, et seq.

159.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.).  Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide.  During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury.

160.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, et seq.  Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic doxycycline hyclate and

40

glyburide were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, et seq. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all forms of relief available under Iowa Code §§ 553, et seq.

161. Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, §§ 50-101, et seq. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of

41

Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, et seq. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, et seq.

162.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, §§ 1101, et seq.). Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et*

42

*seq.*

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated §§ 445.771, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide.  During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

164.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes §§ 325D.49, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic

doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

165. Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal

44

conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

166.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4 Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiff and other

similarly situated third party payers in the Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

167.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated §§ 598A.010, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide.  During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide

competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide.  During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.  Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated §§ 57-1-1, *et seq*.  Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices

47

for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

170. Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Laws §§ 340, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide that were higher than they would have been absent the Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

48

Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

171. Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

172. Defendants have entered into an unlawful agreement in restraint of trade in

violation of North Dakota Century Code §§ 51-08.1-01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

173.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and other similarly situated third party

50

payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

174.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the

51

Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

175.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

176.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

177.    Dendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.* Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and other similarly situated third party payers in the Class were

deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide.  During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

178.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*  Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide.  During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury.  By reason of the

54

foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

179.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*. Defendants' combinations or conspiracies had the following effects: (1) generic doxycycline hyclate and glyburide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic doxycycline hyclate and glyburide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and other similarly situated third party payers in the Class were deprived of free and open competition; and (4) Plaintiff and other similarly situated third party payers in the Class paid supracompetitive, artificially inflated prices for generic doxycycline hyclate and glyburide. During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other similarly situated third party payers in the Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and other similarly situated third party payers in the Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

180.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, et. seq. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling,

and/or maintaining at non-competitive and artificially inflated levels, the prices at which generics Doxy DR and Glyburide was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Class. The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and the members of the Class were deprived of free and open competition; and (4) Plaintiff and the members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff and the members of the Class seek all relief available under that statute.

181.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, et seq. During the Class Period, Defendants manufactured, marketed, sold, or distributed generics Doxy DR and Glyburide in California, and committed and continue to

commit acts of unfair competition, as defined by Sections 17200, et seq. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200, et seq., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, et seq. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generics Doxy DR and Glyburide in the State of California within the meaning of Section 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiff and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been

obtained by Defendants as a result of such business acts or practices. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiff and the members of the Class to pay supracompetitive and artificially-inflated prices for generics Doxy DR and Glyburide. Plaintiff and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

182. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generics Doxy DR and Glyburide was sold, distributed or obtained in the District of Columbia. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff was not aware of Defendants' price-fixing conspiracy and was therefore

58

unaware that it was being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generics Doxy DR and Glyburide. Defendants had the sole power to set that price and Plaintiff had no power to negotiate a lower price. Moreover, Plaintiff lacked any meaningful choice in purchasing generics Doxy DR and Glyburide because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges. Defendants' conduct with regard to sales of generics Doxy DR and Glyburide, including their illegal conspiracy to secretly fix the price of generics Doxy DR and Glyburide at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generics Doxy DR and Glyburide. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and the Class were deprived of free and open competition; and (4) Plaintiff and the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair

competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

183.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Florida; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide.  During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

184.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, et seq.  Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)

60

generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

185.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, et seq. Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generics Doxy DR and Glyburide was sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiff and members of the Class. The aforementioned conduct on the part of the Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide

61

price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiff and the members of the Class were deprived of free and open competition; and (4) Plaintiff and the members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch 93A, §§ 2, 11, that were knowing or willful, and, accordingly, Plaintiff and the members of the Class seek all relief available under that statute, including multiple damages.

186.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, et. seq. Plaintiff and members of the Class purchased generics Doxy DR and Glyburide for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generics Doxy DR and Glyburide in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generics Doxy DR and Glyburide was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was

62

unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for generics Doxy DR and Glyburide. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Class as they related to the cost of generics Doxy DR and Glyburide they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generics Doxy DR and Glyburide by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generics Doxy DR and Glyburide were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Class to believe that they were purchasing generics Doxy DR and Glyburide at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Class seek all relief available under Missouri's Merchandising Practices Act, specifically

Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce...," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, et seq., 15 CSR 60-8.010, et seq., and 15 CSR 60-9.010, et seq., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

187.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, et seq., and §§ 30-14-201, et. seq. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Montana; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants marketed, sold, or distributed generics Doxy DR and Glyburide in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, et seq., and §§ 30-

14-201, et. seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

188.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generics Doxy DR and Glyburide was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Class.  The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and the members of the Class and the prices paid by them for generics Doxy DR and Glyburide as set forth in N.M.S.A., § 57-12-2E.  Plaintiff was not aware of Defendants' price-fixing conspiracy and was therefore unaware that it was being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for generics Doxy DR and Glyburide. Defendants had the sole power to set that price and Plaintiff had no power to negotiate a lower price.  Moreover, Plaintiff lacked any meaningful choice in purchasing generics Doxy DR and Glyburide because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges.  Defendants' conduct with regard to sales of generics Doxy DR and Glyburide, including their illegal conspiracy to secretly fix the price of generics Doxy DR and Glyburide at supracompetitive levels and overcharge consumers, was

65

substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generics Doxy DR and Glyburide. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and the members of the Class were deprived of free and open competition; and (4) Plaintiff and the members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, et seq., and, accordingly, Plaintiff and the members of the Class seek all relief available under that statute.

189.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generics Doxy DR and

Glyburide was sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Class. Defendants and their co- conspirators made public statements about the prices of generics Doxy DR and Glyburide that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generics Doxy DR and Glyburide; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generics Doxy DR and Glyburide were misled to believe that they were paying a fair price for generics Doxy DR and Glyburide or the price increases for generics Doxy DR and Glyburide were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generics Doxy DR and Glyburide would have an impact on New York consumers and not just the Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generics Doxy DR and Glyburide would have a broad impact, causing consumer class members who indirectly purchased generics Doxy DR and Glyburide to be injured by paying more for generics Doxy DR and Glyburide than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is

conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout New York; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants marketed, sold, or distributed generics Doxy DR and Glyburide in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generics Doxy DR and Glyburide in New York. Plaintiff and members of the Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

190.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generics Doxy DR and Glyburide was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Class. Defendants' price- fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self- concealing actions, of

68

which Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generics Doxy DR and Glyburide created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. During the Class Period, Defendants marketed, sold, or distributed generics Doxy DR and Glyburide in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generics Doxy DR and Glyburide in North Carolina. Plaintiff and members of the

69

Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

191.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act (R.I. Gen. Laws §§ 6-13.1-1, et seq.). Members of this Class purchased generics Doxy DR and Glyburide for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generics Doxy DR and Glyburide was sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for generics Doxy DR and Glyburide. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generics Doxy DR and Glyburide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high

70

levels throughout Rhode Island; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generics Doxy DR and Glyburide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generics Doxy DR and Glyburide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Class as they related to the cost of generics Doxy DR and Glyburide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

192.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, et seq.). Defendants' combinations or conspiracies had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generics Doxy DR and Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3)

71

Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide.  During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, et seq., and, accordingly, Plaintiff and the members of the Class seek all relief available under that statute.

193.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, et seq.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generics Doxy DR and Glyburide was sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful activities and artificially inflated prices for generics Doxy DR and Glyburide.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' generics Doxy DR and Glyburide prices were competitive and fair.  Defendants' unlawful conduct had the following effects: (1) generics Doxy DR and Glyburide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generics Doxy DR and

Glyburide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Class were deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for generics Doxy DR and Glyburide. As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generics Doxy DR and Glyburide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generics Doxy DR and Glyburide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, et seq., and, accordingly, Plaintiff and members of the Class seek all relief available under that statute. Plaintiff and other similarly situated third party payers in the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and other similarly situated third party payers in the Class have paid more for generic doxycycline hyclate and glyburide than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful. In addition, Defendants have profited significantly from the aforesaid conspiracy.

Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiff and other similarly situated third party payers in the Class. Accordingly, Plaintiff and other similarly situated third party payers in the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## V.    Count V: Unjust Enrichment

194.    Plaintiff repeats the allegations in paragraphs 1 through 110 as if fully set forth herein.

195.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generics Doxy DR and Glyburide.

196.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the class members for generics Doxy DR and Glyburide manufactured by Defendants during the Class Period.

197.    Plaintiff and the class members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the class members are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the class members may make claims on a *pro rata* basis.

## JURY TRIAL DEMAND

198.    Plaintiff demands a trial by jury on all of the triable issues within this pleading pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

199.    WHEREFORE, Plaintiff, individually and on behalf of the Class described herein, prays for the following relief:

a. Find that this action satisfies the prerequisites for maintenance of a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), and certify the respective Class;

b. Designate Plaintiff as representative for the respective class and Plaintiff's undersigned counsel as Class Counsel for the respective class;

c. Issue a judgment against Defendants that:

    i.    Adjuges and decress that Defendants violated RICO pursuant to 18 U.S.C. §§ 1962(c), 1964(c) and 1962(d).

    ii.    Adjudges and decrees that Defendants violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1 and 3.

    iii.    Enjoins and restrains Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners,

75

agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive practices set forth above

      iv.   Adjudges and decrees that Defendants violated the States' Antitrust and Consumer Protection laws as set forth above.

      v.   Awards to Plaintiff and the plaintiff class disgorgement of the Defendants' ill-gotten gains and any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal law or restore competition;

      vi.   Awards to Plaintiff and the plaintiff class treble damages, their costs, and reasonable attorneys fees, plus interest;

      vii.   Grants Plaintiff and the class alleged herein such other and further relief as the Court deems just and proper under the circumstances.

Dated:  January 31, 2017

Respectfully submitted by,

Neal L. Moskow, Esq.
Fed. Bar. No. CT 04516
Ury & Moskow, L.L.C.
883 Black Rock Turnpike
Fairfield, CT 06825
Telephone (203) 610-6393
Facsimile: (203) 610-6399
neal@urymoskow.com

To be moved *pro hac vice*:

Christopher L. Coffin
Nicholas R. Rockforte
Courtney L. Stidham
PENDLEY, BAUDIN & COFFIN, LLP
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Phone: (504) 355-0086
ccoffin@pbclawfirm.com
nrockforte@pbclawfirm.com
cstidham@pbclawfirm.com

Michael L. Baum
R. Brent Wisner
BAUM, HEDLUND, ARISTEI &
GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA  90025
Tel: (310) 207-3233
Fax: (310) 820-7444
*Counsel for Plaintiffs*

77